# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO.: *12CV81033MIDDLEBROOKS/BRANNON*

SECURITIES AND EXCHANGE COMMISSION,           )
                                              )
     **Plaintiff,**                        )
                                              )
**v.**                                        )
                                              )
JOSEPH HILTON, F/K/A JOSEPH YURKIN,           )
PACIFIC NORTHWESTERN ENERGY LLC,              )
ROCK CASTLE DRILLING FUND LP,                 )
ROCK CASTLE DRILLING FUND II LP, AND          )
NEW HORIZON PUBLISHING INC.                   )
                                              )
     **Defendants.**                      )
_____ )

FILED by _____ D.C.

SEP 2 4 2012

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission alleges:

## I. INTRODUCTION

1.  The Commission brings this action to enjoin a recidivist securities violator and the companies he controls from continuing to defraud investors through the ongoing sale of securities in violation of the anti-fraud and registration provisions of the federal securities laws.

2.  In 2010, this District Court entered a Final Judgment, by consent, in an enforcement action the Commission filed against Joseph Yurkin for violations of the anti-fraud and registration provisions of the federal securities laws.  Yurkin has since changed his name to Joseph Hilton so potential investors will not learn of his past and has gone on to defraud investors again – not once, but at least twice.

3.  From no later than March 2011 until January 2012, Hilton sold securities in the form of limited partnership units in at least three oil drilling projects in Tennessee sponsored by United States Energy Corporation ("U.S. Energy").  To lure investors, Hilton misrepresented his

identity, the risks associated with the investment, the anticipated dividends due to investors, and the amount of oil US Energy's wells produced.

4.    Not only did Hilton make false representations to potential investors, he also managed a boiler room and sales agents to assist him in soliciting contributions. Hilton caused companies he controls, Pacific Northwestern Energy LLC ("Pacific") and New Horizon Publishing Inc., to pay these sales agents commissions in exchange for finding investors and selling US Energy securities.

5.    The US Energy offerings raised approximately $2.5 million from more than 100 investors nationwide.

6.    In a second series of offerings from February 2012 to the present, Hilton, Pacific, Rock Castle Drilling Fund LP ("Rock Castle I"), and Rock Castle Drilling Fund II LP ("Rock Castle II") have raised at least $789,000 from approximately 76 investors nationwide by offering and selling unregistered securities in the form of units consisting of partnership shares in Rock Castle I and Rock Castle II. The companies purportedly generate profits from oil drilling projects in Kentucky.

7.    In connection with the offer and sale of these securities, Hilton, Pacific, Rock Castle I, and Rock Castle II are making numerous material misrepresentations and omissions to investors in telephone conversations, marketing materials, a private placement memoranda ("PPM"), and filings with the Commission. These include false claims that Rock Castle I is drilling in oil fields Exxon Mobil Corporation abandoned because Exxon – unlike Rock Castle I – purportedly lacked the technology to capture the oil.

8.    Hilton, Pacific, Rock Castle I, and Rock Castle II are also overstating Pacific's oil well production and drilling success by telling potential investors Pacific's drillers successfully

drilled a well in 2011 that produces 300 barrels of oil each day.   These claims are patently false. Exxon has never drilled for oil or held a drilling license in the Rock Castle I oil field.  Nor has the well Hilton touts ever produced 300 barrels of oil each day.   Instead, that well produces approximately 10 barrels of oil each day.

9.      Additionally, Pacific and Rock Castle I tout Hilton's successful business experience in the oil industry and assure potential investors he has never been the subject of state regulatory actions or a court-imposed receivership.  In truth, however, Hilton's experience in the oil industry only began last year, when he began soliciting investors for the U.S. Energy offerings.  Further, in addition to the prior Commission action, several states have imposed cease-and-desist orders against Hilton to prevent him from engaging in the sale of securities.

10.      Additionally, Rock Castle II assures investors their contributions are not going to line the pockets of Hilton when, in truth, Hilton is funneling investor contributions to himself.

11.      Through their conduct, Hilton, Pacific, Rock Castle I, and Rock Castle II each are violating the anti-fraud and registration provisions of the federal securities laws, and Hilton, Pacific, and New Horizon are violating the registration provisions of the federal securities laws. Based on the ongoing nature of their violations and the scienter the Defendants have demonstrated through their willful and wanton disregard for the federal securities laws, the Defendants have shown they will continue to violate the law unless the Court grants the injunctive and other relief the Commission seeks.

3

## II. DEFENDANTS AND RELATED ENTITIES

### A. Defendants

12.     Hilton, 51, resides in Boca Raton, Florida, and is the president of Pacific and New Horizon.  From March 2011 until January 2012, Hilton was Vice President of US Energy.  He was known by his given name, Joseph Yurkin, until November 2011, when he changed his name to Joseph Hilton.  The Commission previously filed an enforcement action against Hilton for violations of the federal securities laws.  *See SEC v. Homeland Communications Corp., et al.*, Case No. 07-80802-MARRA (S.D. Fla. Nov. 16, 2007), in which Hilton consented to a Final Judgment enjoining him from future violations of the anti-fraud and registration provisions of the federal securities laws, imposing a penny stock bar, and ordering him to pay $915,704 in disgorgement, prejudgment interest and civil penalties.  Hilton has not satisfied the Final Judgment.  In 2008, the Commission entered an order barring Hilton from associating with a broker-dealer.  *In the Matter of Joseph Yurkin*, Exchange Act Release No. 58768 (Oct. 10, 2008). In addition, Texas and Colorado have entered cease-and-desist orders against Hilton to prevent him from offering securities.  *In the Matter of Homeland Communications Corp., et al.*, Case No. Enf-06-CDO-1621 (Tex. Oct. 12, 2006); *In the Matter of United States Energy Corp, et. al*, Case No. XY 12-CD-07 (Colo., Feb. 2, 2012).  Hilton has never been registered with the Commission in any capacity.

13.     Pacific is a Wyoming corporation incorporated in November 2011 with its principal places of business in Cheyenne, Wyoming.  Pacific purports to be in the business of oil development and investment with drilling locations in the Kentucky region known as the "The Knox Formation."  Pacific has never registered any offering of securities or a class of securities with the Commission.

14.     Rock Castle I is a Wyoming limited partnership incorporated in February 2012, with its principal place of business in Boca Raton, Florida. The Company is purportedly in the business of acquiring oil drilling leases and drilling for oil, and Pacific is the general partner. Rock Castle I has never registered any offering of securities or a class of securities with the Commission.

15.     Rock Castle II is a Wyoming limited partnership incorporated in June 2012 with its principal place of business in Boca Raton, Florida. The Company is purportedly in the same business as Rock Castle I, and Pacific is the general partner. Rock Castle II has never registered any offering of securities or a class of securities with the Commission.

16.     New Horizon is a Florida corporation Hilton incorporated in March 2009 that purports to be in the business of selling sales leads. Hilton is the sole officer and director of New Horizon. The Company has never been registered with the Commission in any capacity.

### B. Related Entities and Individuals

17.     US Energy is a Florida corporation with its principal place of business in Clearwater, Florida. Hilton served as Vice President of US Energy from March 2011 until January 2012. It is engaged in the business of U.S. oil exploration and investment and served as the general partner for at least three offerings of participation or limited partnership units, including in the TN-KY Development Fund, L.P. ("TN-KY I"), the TN-KY Development Fund II, L.P. ("TN-KY II"), and the TN-KY Development Fund III, L.P. ("TN-KY III") (collectively, "TN-KY I-III"). US Energy commenced the TN-KY I offering in approximately May 2011, the TN-KY II offering in approximately September 2011, and the TN-KY III offering in approximately November 2011. In January 2012, the state of Pennsylvania issued a cease-and-desist order against US Energy preventing it from offering securities. *In the Matter of TN-KY*

5

*Development Fund III, L.P., et. al*, Admin. Proc. Docket No. 2012-01-06 (Jan. 25, 2012).  In February 2012, the State of Colorado issued a cease-and-desist order preventing US Energy from offering securities.  *In the Matter of United States Energy Corp, et. al*, Case No. XY 12-CD-07 (February 2, 2012).  US Energy has never been registered with the Commission in any capacity.

18.     TN-KY I-III are Florida limited partnerships started in June 2011, September 2011 and December 2011, respectively, and are located in Clearwater, Florida.  They are in the business of acquiring oil drilling leases and drilling for oil.  US Energy is the general partner for all the partnerships.  None of the partnerships have registered any offering of securities under the Securities Act or a class of securities under the Exchange Act.  In January 2012, the State of Pennsylvania issued a cease-and-desist order against TN-KY III to prevent it from offering securities.  *In the Matter of TN-KY Development Fund III, L.P., et. al*, Admin. Proc. Docket No. 2012-01-06 (Jan. 25, 2012).

### III.  JURISDICTION AND VENUE

19.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a); and Sections 21(d), 21(e), and Section 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e), and 78aa.

20.     This Court has personal jurisdiction over the Defendants, and venue is proper in the Southern District of Florida, because many of the Defendants' acts and transactions constituting violations of the Securities Act and the Exchange Act occurred in the Southern District of Florida.  In addition, New Horizon, Rock Castle I and Rock Castle II's principal places of business are in the Southern District of Florida, Hilton resides in the Southern District of Florida, Hilton manages Pacific's operations from the Southern District of Florida, and Pacific receives investor contributions at its address in Boca Raton, Florida.

21.      In connection with the conduct alleged in this Complaint, the Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails.

## IV.  THE US ENERGY FRAUD

### A.  The US Energy And TN-KY I-III Offerings

22.      In approximately May 2011, US Energy began offering limited partner interests in TN-KY I.   The terms of the offering were memorialized in a PPM, pursuant to which each partnership unit consisted of a .5 percent working interest and .3 percent net revenue interest in TN-KY I's drilling leases, priced at $5,000 each.   The PPM stated US Energy sought to raise $1 million for this offering.

23.      According to the PPM, TN-KY I would acquire a 100 percent working interest and a 60 percent net revenue interest in drill site locations in Overton County, Tennessee and Christian County, Kentucky, and would generate profits by drilling eight wells there. According to the PPM, a working interest is defined as "an interest in an oil and gas lease that gives the owner of the interest the right to drill for and produce oil and gas on the leased acreage…."

24.      In approximately September 2011, US Energy began offering limited partner interests in TN-KY II.   The terms of the offering were memorialized in a PPM, pursuant to which each partnership unit consisted of a .5 percent working interest and .3 percent net revenue interest in TN-KY II's drilling leases, priced at $5,000 each.   The PPM stated US Energy sought to raise $875,000 for this offering.

25.     According to the PPM for the TN-KY II offering, TN-KY II would acquire a 100 percent working interest and a 60 percent net revenue interest in drill site locations in Overton County, Tennessee and Monroe County, Kentucky, and would generate profits by drilling five wells there.

26.     In approximately November 2011, US Energy began offering limited partner interests in TN-KY III.   The terms of the offering were memorialized in a PPM, pursuant to which each partnership unit consisted of a 2 percent working interest and 1.2 percent net revenue interest in TN-KY III's drilling leases, priced at $17,500 each.   The PPM stated US Energy sought to raise $875,000 for this offering.

27.     According to the PPM for the TN-KY III offering, TN-KY III would acquire a 100 percent working interest and a 60 percent net revenue interest in drill site locations in Overton County, Tennessee and Monroe or Cumberland County, Kentucky, and would generate profits by drilling five wells there.

28.     No registration statement has been filed or was in effect with the Commission in connection with the securities US Energy offered in TN-KY I, TN-KY II, or TN-KY III, nor is US Energy entitled to any registration exemption.

**B.  Solicitation of Investors**

29.     From March 2011 until January 2012, Hilton solicited investor contributions for US Energy, both directly and by managing a small boiler room in Boca Raton where Hilton and at least two other individuals placed cold calls to potential investors nationwide.

30.     After contacting potential investors by telephone, Hilton sent them marketing materials that included a letter he signed, a document Hilton created showing projected earnings,

a PPM, and an investment suitability questionnaire. Hilton then placed additional telephone calls to potential investors to close the sales.

31.     Hilton sent frequent e-mails to potential and existing investors updating them on the status of US Energy's oil drilling efforts and encouraging them to make initial or additional investments.

32.     By March 2012, US Energy had raised more than $2.5 million from more than 100 investors.

## C. Misrepresentations and Omissions in the US Energy Offerings

33.     In connection with US Energy's TN-KY I-III offerings, Hilton made material misrepresentations and omissions about: (1) US Energy's oil well assets; (2) the consequence of finding natural gas in the oil wells; (3) the status and productivity of the wells; and (4) projected monthly income.

### 1. False Statements About US Energy's Well Assets

34.     Hilton made false statements to potential investors about the number and location of US Energy's wells. For example, from approximately June 2011 until January 2012, Hilton sent a letter bearing his signature to potential investors stating US Energy owned 53 active oil and gas wells in Kentucky and Tennessee. This claim was patently false. As of June 1, 2011, US Energy had no active oil wells whatsoever and has never owned any wells in Kentucky. As Vice President of US Energy, Hilton received well status spreadsheets, and those spreadsheets showed only 18 wells as of January 2012. Thus, he knew US Energy did not own 53 active oil and gas wells.

35.     On August 6, 2011 and again on September 29, 2011, Hilton sent emails to potential investors claiming US Energy had plans to drill for oil in Wyoming and North Dakota. This claim was also false. US Energy had no plans to drill in Wyoming or North Dakota.

36.     Between September 2011 and January 2012, Hilton emailed investors on at least eight occasions noting the existence of, or future plans for, additional and separate natural gas wells. These statements were false. US Energy had no natural gas wells.

37.     As Vice President of US Energy, Hilton received spreadsheets showing US Energy's well assets, which included only oil wells, and knew US Energy was not in the business of drilling natural gas wells. Further, Hilton knew US Energy lacked resources to drill in North Dakota because US Energy's CEO told him the cost was too high – in the area of $15 million.

## 2.  Misleading Statements About Natural Gas Production

38.     Hilton lured potential investors by making false statements that US Energy had natural gas wells – when it had none – and misleading statements that revenue would increase if natural gas was hit. For example, in emails to investors, Hilton maintained the sale of natural gas encountered in the oil wells would translate into additional revenue for unit holders. This statement was misleading because Hilton failed to tell potential investors finding natural gas diminished and disrupted oil production, a natural gas pipeline was required to accommodate the production of natural gas from a well, and it would be necessary for US Energy to expend resources to erect a plant at the well site to handle and commercialize the natural gas.

39.     Nonetheless, Hilton continued to tout the existence, completion, and production of multiple natural gas wells by US Energy, despite knowing US Energy lacked a natural gas well, let alone a plant to commercialize natural gas.

10

### 3. <u>Well Status And Productivity</u>

40.     Hilton also misrepresented to investors the status of specific wells.  For example, on November 11 and November 16, 2011, Hilton announced to investors the so-called "Linder" well was going into production and was "highly successful."  This statement was false.  When Hilton made these announcements, the "Linder" well was not producing any oil.

41.     On December 15, 2011, Hilton emailed investors to tell them that the "Stover #7" and "Melton #1" wells were in the "completion stage."  Once an oil well is verified to have commercially viable quantities of oil for extraction it must be "completed" by strengthening the well hole with casing, evaluating the pressure and temperature of the formation, and then installing the proper equipment to ensure an efficient flow of oil out of the well.

42.     Hilton's statements about the "Stover #7"and "Melton #1" wells were false. When Hilton made these statements, the wells had not reached the completion stage.

43.     Hilton received spreadsheets detailing oil production for each of US Energy's wells and also received oral production updates from U.S. Energy's president on an almost daily basis, and therefore knew his statements about US Energy's well status were false.

44.     Hilton also falsely represented how much oil US Energy's wells produced.  For example, Hilton created and distributed to potential investors materials falsely claiming each of US Energy's eight oil wells was projected to produce 100 barrels per day. Hilton had no reasonable basis to make these claims.  When Hilton made these claims, US Energy's most productive well was producing approximately 10 barrels of oil per day – or just ten percent of what Hilton claimed.

45.     Hilton also made false claims to potential investors about oil production in emails. For example, on August 8, 2011, Hilton emailed investors that 115 barrels of oil would be

11

transported every five or six days from the so-called "Ruble" well.  On September 2, 2011, Hilton emailed investors the so-called "Cooper" well was producing 70 barrels per day, while the "Ruble" well was producing "300+" barrels per day.

46.    These claims were all false.  The Ruble well has never produced 300 barrels of oil per day.  It produces an average of only 10 barrels per day.  Nor did the Cooper well produce 70 barrels of oil per day.

47.    Hilton had no basis for making these false statements about US Energy's oil production and knew these statements were false because he received oil production reports and oral production updates from U.S. Energy's president on a nearly daily basis when he made them.

### 4. **Projected Monthly Income**

48.    Hilton's exaggerated production claims underpinned his wildly inflated monthly income projections.  In 2011, Hilton created and distributed to potential investors a projection sheet estimating TN-KY I investors who purchased a unit for $5,000 would earn monthly revenue of $3,886.00 to $4,100.00 per unit.

49.    Similarly, in a June 1, 2011 letter from Hilton to potential investors, he projected revenue of approximately $6,400 per month per unit.

50.    Hilton had no reasonable basis for making these representations.  He based these estimates on his false claims that the wells could produce 100 barrels per day.  However, Hilton received oil production updates from U.S. Energy's president on a nearly daily basis that reflected far less than what he estimated to investors.

### D. **Hilton's Scheme To Conceal His Background And Solicit Investors**

51.    From no later than March 2011 until approximately January 2012, Hilton engaged in a fraudulent scheme to conceal from investors the Commission's prior enforcement action against him for defrauding investors and the Final Judgment against him in that case.

52.    Not only did Hilton fail to disclose the prior Commission against him, but he assumed an alias so potential investors would not realize he was actually Joseph Yurkin, against whom the Commission obtained a temporary restraining order for defrauding investors in connection with an offering fraud in 2007, and against whom the state of Texas had entered a cease-and-desist order barring him from offering and selling securities.

53.    In November 2011, Hilton formally changed his name through the state of Florida, and did so to avoid association with the prior Commission action.

54.    Hilton used an alias and then changed his name in order to avoid negative association with his regulatory history – a history potential investors would have wanted to know.

### E. **Hilton, Pacific, and New Horizon Acted As Unregistered Broker-Dealers**

55.    US Energy retained Hilton to solicit investors for the TN-KY I-III offerings.  US Energy agreed to pay Hilton's companies, New Horizon and then Pacific, for raising investor funds directly and through a boiler room where Hilton managed at least two individuals to assist him with investor solicitation.

56.    As a result of his promotional efforts, US Energy paid Hilton, directly and through New Horizon and Pacific, nearly $400,000.  US Energy also paid Hilton for the promotional efforts of his agents.  To conceal the true nature of his work, Hilton required US

Energy to characterize its payments to him as a salary rather than traditional broker-dealer commissions.

57.     Hilton also entered into separate agreements with the sales agents who worked in his boiler room.  Hilton paid these agents commissions equal to six percent of the investor contributions they solicited.

### IV.  THE ONGOING PACIFIC FRAUD

#### A.  Solicitation of Investors

#### 1. Rock Castle I

58.     Pacific, Rock Castle I, and Hilton, directly and through Pacific and Rock Castle I, have been offering and selling partnership units in Rock Castle I from at least February 2012 through present, through personal telephone calls to potential investors and mailing a PPM and other written materials to potential investors.

59.     According to a PPM and term sheet Hilton sends potential investors, Rock Castle I is a partnership organized to acquire a 100 percent "working interest" and 70 percent net revenue interest in two oil wells in Rockcastle County, Kentucky, at a total cost of $350,000, and then commence drilling of these two wells.  According to the PPM, a working interest is defined as "an interest in an oil and gas lease that gives the owner of the interest the right to drill for and produce oil and gas on the leased acreage...."  The Rock Castle I PPM represents to potential investors Pacific will drill, test, and sell the oil and gas in the two wells.

60.     The terms of the Rock Castle I offering are memorialized in a PPM dated February 16, 2012.  Pursuant to the PPM, each partnership unit consists of a 2.857 percent working interest and a 2 percent net revenue interest in Rock Castle I's drilling leases, priced at $10,000 each.  The PPM states Rock Castle I seeks to raise $350,000.

61.     The Rock Castle I PPM states the minimum investment is $10,000.  However, in March and June 2012, Hilton solicited at least two investors who each purchased 25 percent of one unit in Rock Castle I for $2,500.

62.     The PPM advises potential investors Rock Castle I will make quarterly distributions derived primarily from oil and gas production and sales, with investors receiving 90 percent of each distribution and Pacific receiving 10 percent.

63.     Together with the PPM, Hilton also sends potential investors a limited partnership agreement to be executed by the investor and Hilton on behalf of Pacific, which is Rock Castle I's general partner.

64.     Hilton has told at least one potential investor she could expect to receive monthly revenue from her investment in Rock Castle I.  Specifically, in early 2012, Hilton solicited an investor who resides in Connecticut and told her she could expect to receive $1,000 per month in revenue if she purchased one partnership unit in Rock Castle I.  This investor contributed $2,500 to acquire 25 percent of one partnership unit.

65.     Hilton has also told at least two potential investors in connection with the Rock Castle I investment that Pacific has acquired the oil drilling leases of a major oil company.

66.     Once Hilton persuades a potential investor to purchase units of Rock Castle I, he instructs the investor to send to Pacific's address in Boca Raton, Florida a check payable to Rock Castle I.

67.     No registration statement has been filed or was in effect with the Commission in connection with the Rock Castle I securities offering, nor is there any entitlement to a registration exemption.

### 2. Rock Castle II

68.     Rock Castle II, Pacific, and Hilton, directly and through Pacific and Rock Castle II, have been offering and selling units in Rock Castle II from no later than July 2012 through present.

69.     The terms of the Rock Castle II offering are memorialized in the term sheet, pursuant to which each unit consists of a .75 percent working interest in the four Rock Castle II wells, priced at $10,000 each.  According to the PPM, Rock Castle II seeks to sell 80 units and raise $800,000.

70.     According to another term sheet Hilton sends potential investors, Rock Castle II owns and will drill four oil wells in Rockcastle County, Kentucky – the McQueen Well 2, McQueen Well 3, Van Winkle Well 2, and Van Winkle Well 3.  According to materials Hilton has provided to at least one investor, Pacific is "drilling to completion" and has discovered gas on the Van Winkle 2 well.

71.     Hilton contacts potential investors by telephone and sends them marketing materials, subscription agreements, a suitability questionnaire, an investment term sheet, and copies of drilling permits and reports.

72.     In June 2012, Hilton sent at least one potential investor a written solicitation to invest in Rock Castle II.  In it, Hilton told the investor the Rock Castle II project will be comprised of four oil and/or natural gas wells, only 80 units will be available, and investors will receive monthly royalty payments.  Hilton also tells investors Rock Castle II will drill two wells on the same lease Rock Castle I has on a well that purportedly "encountered commercial quantity oil on May 24, 2012."

73.     Hilton also sends potential investors written instructions entitled "How to Subscribe for Unit Funds," directing them to complete the subscription agreement and suitability questionnaire and send those documents together with a check payable to Rock Castle II to Pacific's mailing address in Boca Raton, Florida.

74.     No registration statement has been filed or was in effect with the Commission in connection with the Rock Castle II securities offering, nor is there any entitlement to a registration exemption.

75.     Since the commencement of the offering, Hilton, Pacific, Rock Castle I, and Rock Castle II have raised approximately $789,000 from at least 76 investors nationwide.

**B.   Fraudulent Misrepresentations and Omissions in the Rock Castle I & II Offerings**

76.     In connection with Rock Castle I and II's offering, Hilton, Pacific, Rock Castle I, and Rock Castle II are making material misrepresentations and omissions about: (1) the accomplishments of Pacific's oil well drillers; (2) the prospects for oil; (3) the use of investor funds; or (4) Hilton's background and history with regulatory agencies.

**1.   False Statements About Oil Well Drilling And Production**

77.     To lure potential investors to Rock Castle I and Rock Castle II, Hilton is making false statements about the success of Pacific's drillers in drilling oil wells.

78.     Hilton has distributed to at least three potential investors a photograph of a well gushing oil with Hilton's handwritten note reading "The Ruble Well was produced by Pacific Northwestern drillers on July 1, 2011" and indicating the Ruble Well produces "300 barrels per day."

79.     Hilton's statement to potential investors that the Ruble Well produces 300 barrels of oil per day is false. The Ruble Well has never produced 300 barrels of oil per day. The most

the well ever produced was 120 barrels of oil per day, and that only occurred on one day – the first day the well hit oil in July 2011. After that, the Ruble Well production tapered off to approximately 10 barrels of oil per day and continued producing oil at that rate.

80.     From approximately April 2011 until about January 2012, Hilton received reports about the Ruble Well's oil production and has no reasonable basis for claiming it produces 300 barrels per day.

## 2. <u>False Statements Concerning The Prospects For Oil</u>

81.     In order to bolster his claims that the Rock Castle I wells are good drilling prospects, Hilton is making false statements to potential investors that Exxon Mobil Corporation, a major oil company, once drilled in the same oil field as Rock Castle I in Rockcastle County, Kentucky. But Exxon Mobil purportedly lacked the technology to drill the oil from the ground and therefore abandoned its wells and drilling leases, which Pacific then acquired. By making these representations, Hilton is creating the false impression an untapped resource now lies in wait for Rock Castle I to tap.

82.     For example, in early 2012, Hilton represented to a potential investor the Rock Castle I wells are located in an oil field where Exxon Mobil drilled for oil. Hilton told the potential investor Exxon Mobil abandoned its wells in this oil field because there was no technology available to drill the oil at that time. Hilton also told this potential investor he estimates Rock Castle I will produce 100 to 150 barrels of oil per day in these oil fields.

83.     These statements are patently false and Hilton has no reasonable basis for making them. Exxon Mobil has not had any drilling projects in Rockcastle County, Kentucky, let alone in the oil fields where Rock Castle I is purportedly drilling.

84.    Additionally, Hilton is telling investors Pacific acquired Exxon Mobil's drilling leases for the Rock Castle I oil field.  This statement is false.  Pacific has not acquired any drilling leases from Exxon Mobil.  Hilton is President of Pacific and knows Pacific has never acquired any drilling leases from Exxon Mobil, let alone drilling leases for the oil field where Rock Castle I or Rock Castle II is purportedly drilling.

### 3. Misuse of Investor Proceeds

85.    Hilton, directly and through Pacific, is also misusing and misappropriating Rock Castle I and Rock Castle II investor contributions deposited in Pacific's account.

86.    On June 1, 2012, Hilton filed with the Commission a Form D for Rock Castle II stating no investor contributions would be used for payments to himself.  Hilton has directed at least one potential investor to this Form D by forwarding a screenshot of the Commission's Electronic Data Gathering, Analysis, and Retrieval system showing a link to this Form.

87.    Contrary to Hilton's statement in the Rock Castle II Form D, Hilton is misappropriating investors' contributions.  Since approximately early July 2012, Hilton has taken about $14,000 of investors' commingled contributions in Rock Castle I and Rock Castle II.  Hilton has not amended the Rock Castle II Form D, which remains in effect.

88.    As of July 31, 2012, Hilton had misappropriated approximately $41,000 in investors' contributions.  He has failed to disclose these transfers to investors.

### 4. False Statements And Omissions Concerning Hilton's And Pacific's History

89.    Hilton, directly and through Pacific, and Rock Castle I are making false statements to potential investors concerning Hilton's experience and omitting his regulatory history.

90.     For example, Hilton is distributing a Rock Castle I PPM to potential investors that states: "Mr. Hilton has developed a long and lasting relationship with third party drilling and completion experts in these local oil and gas fields."

91.     This statement is false.  Hilton's experience in the oil and gas fields began less than eleven months before the date on the Rock Castle I PPM, in approximately April 2011, when he began working as a telemarketer to solicit investors for another oil and gas drilling venture.  Prior to April 2011, Hilton had no experience in the oil and gas fields.  Further, Hilton's work in the oil and gas fields was limited to soliciting investors until approximately February 2012, when he commenced work on the Rock Castle I investment.  Thus, there is no reasonable basis for the statement in the Rock Castle I PPM about Hilton's long and lasting relationships in the oil and gas fields.

92.     Rock Castle I is also making false claims about Hilton's history with state regulatory agencies.  Specifically, the Rock Castle I PPM, dated February 16, 2012, states that during the past five years, none of Pacific's principals have been the subject of any formal complaint filed with any state regulatory agency.

93.     This statement is false.  Two weeks prior to the Rock Castle I PPM's creation, the State of Colorado issued a cease-and-desist order against Hilton, halting his sale of unregistered securities in that state.  In the Matter of United States Energy Corp, et. al, Case No. XY 12-CD-07 (Colo., Feb. 2, 2012).

94.     Rock Castle I is also making false and misleading statements concerning Hilton's history of the Court placing his company into a receivership.  The Rock Castle I PPM states: "Nor... has a receiver... ever been appointed for the business or property of [Pacific's principals]."  This statement is false.  In 2009, this District Court placed a company Hilton

20

owned into a receivership during the Commission's litigation of the prior securities enforcement action against him.

95.     Additionally, Pacific and Hilton, through Pacific, are making false and misleading statements through the Pacific website by stating, "Pacific-Northwestern Energy has over 35 years of combined experience in the oil and gas industry." This statement is false. Hilton formed Pacific less than one year ago.

## COUNT I

### Sale of Unregistered Securities in Violation of Sections 5(a) and 5(c) of the Securities Act Against Hilton, Pacific, Rock Castle I, and Rock Castle II

96.     The Commission repeats and realleges paragraphs 1 through 5, 12 through 16 through 18, 22 through 32, and 55 through 73 of this Complaint as if fully restated herein.

97.     No registration statement was filed or in effect with the Commission pursuant to the Securities Act and no exemption from registration exists with respect to the securities and transactions described in this Complaint.

98.     Hilton, from no later than March 2011 through present; Pacific and Rock Castle I, from no later than February 2012 through present; and Rock Castle II, from no later than July 2012 through present, directly or indirectly have: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise; (b) carried securities or caused such securities to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; and (c) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise, without a

21

registration statement having been filed or being in effect with the Commission as to such securities.

99.     By reason of the foregoing, Pacific, Rock Castle I, Rock Castle II and Hilton directly or indirectly violated, and, unless enjoined, is reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT II

### Fraud in Violation of Section 10(b) and Rule 10b-5(b) of the Exchange Act
### Against Hilton, Pacific, Rock Castle I, and Rock Castle II

100.    The Commission repeats and realleges paragraphs 1 through 95 of its Complaint.

101.    Hilton, from no later than March 2011 through present; Pacific and Rock Castle I, from no later than February 2012 through present; and Rock Castle II, from no later than July 2012 through present, directly or indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails in connection with the purchase or sale of securities, knowingly, willfully or recklessly have: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and courses of business which have operated, are now operating and will operate as a fraud upon the purchasers of such securities.

102.    By reason of the foregoing, the Hilton, Pacific, Rock Castle I and Rock Castle II directly or indirectly violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## COUNT III

### Fraud in Violation of Section 10(b) and Rules 10b-5(a) and (c) of the Exchange Act
### Against Hilton

103.    The Commission realleges and incorporates paragraphs 1 through 57 of this Complaint.

104.    From no later than March 2011 through at least January 2012, Hilton, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly, willfully or recklessly employed devices, schemes, or artifices to defraud and engaged in acts, practices, or courses of business which operate or would operate as a fraud or deceit upon any person.

105.    By reason of the foregoing, the Hilton directly or indirectly violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Exchange Act Rules 10b-5(a) and (c) [17 C.F.R. § 240.10b-5].

## COUNT IV

### Fraud in the Offer or Sale of Securities in Violation of
### Section 17(a)(1) and (3) of the Securities Act
### Against Hilton

106.    The Commission repeats and realleges paragraphs 1 through 95 of this Complaint as if fully restated herein.

107.    From no later than March 2011 until approximately January 2012, Hilton, directly or indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by use of the mails, in the offer or sale of securities, has knowingly, willfully or recklessly employed devices, schemes or artifices to defraud.

23

108.    By reason of the foregoing, Hilton directly or indirectly violated, and, unless enjoined, is reasonably likely to continue to violate, Sections 17(a)(l) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (a)(3)].

## COUNT V

**Fraud in the Offer or Sale of Securities in**
**Violation of Sections 17(a)(2) of the Securities Act**
**Against Hilton, Pacific, Rock Castle I and Rock Castle II**

109.    The Commission repeats and realleges paragraphs 1 through 95 of this Complaint as if fully restated herein.

110.    Hilton, from no later than March 2011 through present; Pacific and Rock Castle I, from no later than February 2012 through present; and Rock Castle II, from no later than July 2012 through present, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce, or of the mails have: (a) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (b) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

111.    By reason of the foregoing, Hilton, Pacific, Rock Castle I, and Rock Castle II, directly or indirectly violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. §§ 77q(a)(2)].

24

## COUNT VI

### Unregistered Broker-Dealer Conduct in Violation of Section 15(a)(1) of the Exchange Act
### Against Hilton, Pacific, and New Horizon

112.    The Commission repeats and realleges paragraphs 12, 13, 16 through 18, 22

through 32, and 55 through 57 of this Complaint as if fully restated herein.

113.    Hilton, from no later than March 2011 until at least January 2012; New Horizon,

from no later than March 2011 until at least November 2011; and Pacific, from no later than

November 2011 until January 2012, directly and indirectly by the use of the means and

instrumentalities of interstate commerce, while acting as a broker or dealer engaged in the

business of effecting transactions in securities for the accounts of others, effected transactions in

securities, or induced or attempted to induce the purchase and sale of securities, without

registering as a broker-dealer in accordance with Section 15(b) of the Exchange Act, 15 U.S.C. §

78o(b).

114.    By reason of the foregoing, Hilton, Pacific, and New Horizon, directly or

indirectly, violated and, unless enjoined, will continue to violate Section 15(a)(1) of the

Exchange Act [15 U.S.C. § 78o(a)(1)].

## COUNT VII

### In The Alternative, Aiding And Abetting Pacific And New Horizon's Unregistered
### Broker-Dealer Conduct in Violation of Section 15(a)(1) of the Exchange Act
### Against Hilton

115.    The Commission repeats and realleges paragraphs 12, 13, 16 through 18, 22

through 32, and 55 through 57 of this Complaint as if fully restated herein.

116.    New Horizon, from no later than March 2011 until at least November 2011; and

Pacific, from no later than November 2011 until January 2012, directly or indirectly, by the use

of the means and instrumentalities of interstate commerce, while acting as a broker or dealer

engaged in the business of effecting transactions in securities for the accounts of others, effected transactions in securities, or induced or attempted to induce the purchase and sale of securities, without registering as a broker-dealer in accordance with Section 15(b) of the Exchange Act, 15 U.S.C. § 78o(b).

117.    Hilton knowingly or recklessly provided substantial assistance to Pacific or New Horizon in connection with their violations of Section 15(a)(1) of the Exchange Act.

118.    By reason of the foregoing, Hilton aided and abetted Pacific or New Horizon's violations of Section 15(a)(1) of the Exchange Act.  [15 U.S.C. § 78o(a)(1)].

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

### Declaratory Relief

Declare, determine and find that the Defendants have committed the violations of the federal securities laws alleged herein.

### II.

### Temporary Restraining Order, Preliminary Injunction and Permanent Injunction

Issue a Temporary Restraining Order, a Preliminary Injunction and a Permanent Injunction, restraining and enjoining: Defendants Hilton, Pacific, Rock Castle I, and Rock Castle II, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Section 17(a)(2) of the Securities Act and Section 10(b) and Rule 10b-5(b) of the Exchange Act and Sections 5(a) and (c) of the Securities Act.

Issue a Permanent Injunction restraining and enjoining Defendant Hilton, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with him, from violating Rule 10b-5(a) and (c) of the Exchange Act; and Defendants Hilton, Pacific and New Horizon, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Section 15(a)(1) of the Exchange Act.

## III.

## Asset Freeze and Sworn Accountings

Issue an Order freezing the assets of Hilton, Pacific, Rock Castle I, and Rock Castle II until further Order of the Court and requiring Defendants Hilton, Pacific, Rock Castle I, and Rock Castle II to file with this Court sworn written accountings.

## IV.

## Records Preservation

Issue an Order requiring Defendants Hilton, Pacific, Rock Castle I, and Rock Castle II to preserve any records related to the subject matter of this lawsuit that are in their custody or possession or subject to their control.

## V.

## Disgorgement

Issue an Order directing the Defendants to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

## VI.

### Penalties

Issue an Order directing all Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

## VII.

### Order Pursuant To Section 21(e) of the Exchange Act

Issue an Order directing Hilton to comply with the broker-dealer bar the Commission issued against him, *In the Matter of Joseph Yurkin*, Exchange Act Release No. 58768 (Oct. 10, 2008), pursuant to Section 21(e) of the Exchange Act.

## VIII.

### Further Relief

Grant such other and further relief as may be necessary and appropriate.

## IX.

### Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

September 24, 2012

Respectfully submitted,

By:

Amie Riggle Berlin
Senior Trial Counsel
Florida Bar No. 630020
Direct Dial: (305) 982-6322
Direct email: berlina@sec.gov

Attorney for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile:  (305) 536-4154

Susan Cooke Anderson
Senior Counsel
Court ID No. A5501760
Direct Dial: (617) 573-4538
Direct email: andersonsu@sec.gov

**SECURITIES AND EXCHANGE COMMISSION**
33 Arch Street, 23rd Floor
Boston, Massachusetts 02110
Telephone: (617)573-8900
Facsimile:  (617) 573-4590